174 P.3d 1264 (2008)
STATE of Washington, Respondent,
v.
Cory Lamont THOMAS, Appellant.
Nos. 34335-5-II, 34328-2-II, 35660-1-II, 36262-7-II.
Court of Appeals of Washington, Division 2.
January 15, 2008.
*1265 Kathryn A. Russell Selk, Russell Selk Law Office, Seattle, WA, for Appellant.
Cory L. Thomas (Appearing Pro Se), Shelton, WA, for Petitioner.
*1266 P. Grace Kingman, Attorney at Law, Tacoma, WA, for Respondent.

PART PUBLISHED OPINION
ARMSTRONG, J.
¶ 1 Cory Thomas challenges his convictions of second degree assault, fourth degree assault, and telephone harassment, and his exceptional sentence. Among other issues, Thomas contends that the prosecutor improperly argued that Thomas's refusal to return to the crime scene and talk with police was evidence of his guilt. We agree that the argument was improper, and because the State's other evidence was not sufficient to render this constitutional error harmless, we reverse and remand for a new trial. We discuss only those additional issues likely to arise on retrial or that would also require reversal.

FACTS
¶ 2 Cory Thomas and Lavisha Bonds have known each other for 12 years and have a six-year-old child together. At the time of the incident, they were not living together. Thomas did not have a key to Bonds's apartment, but he did keep clothes there and sometimes showered there. At times, he entered the apartment through the bathroom window when Bonds was not home.
¶ 3 One night, Thomas asked Bonds for his clothes back; she told him to return the next morning to get them. She then went out drinking with a friend, Danielle Fletcher. The two women returned to Bonds's apartment at two or three in the morning, and Fletcher spent the night on Bonds's couch.
¶ 4 The next morning, Thomas entered Bonds's home through the bathroom window. He and Bonds got into a fight, and Fletcher called 911. When the police arrived, Thomas was gone and Bonds was holding a bloody towel to her face. Fletcher took Bonds to the emergency room, where she was treated for a fractured nose and bruised tailbone. Over the next few days, Thomas called Bonds's home phone and Fletcher's cell phone multiple times to talk to Bonds. She refused to talk to him.
¶ 5 The State charged Thomas with first degree burglary, second degree assault, intimidating a witness in relation to the reporting or prosecution of abuse or neglect of a minor child, and telephone harassment.
¶ 6 At trial, Bonds testified that the night before the incident, she had a former boyfriend over at her apartment, and his car was out front. Thomas called to ask who was there with her, and when he found out who it was, he got upset. Later that night, Bonds heard Thomas outside her bedroom window saying, "I told you about that dude, you black bitch" and that "[he was] going to beat [her] ass." Report of Proceedings (RP) at 121.
¶ 7 Bonds awoke in the morning to find Thomas in her bedroom, holding bags of his clothes. Thomas said something about the other boyfriend, then came toward her and punched her in the face. Bonds tried to swing back, but she fell to the floor. Thomas started kicking her and hitting her with an aluminum broom handle. Bonds got away and went into the bathroom. Thomas followed her and they "tussl[ed]" some more. RP at 116. Thomas ultimately left with his clothes.
¶ 8 Bonds initially signed a statement that Thomas had broken in, beaten her up, and then fled. Later, in a letter, she recanted most of her statement, and at trial she testified that the incident was blown "[w]ay out of proportion." RP at 105. But she conceded that parts of her recanting letter were not true and that she had written it to lighten Thomas's sentence and minimize his time away from their son. She explained that she and Thomas had had a lot of "tussles" but that he had never hurt her; she had hit him and he had punched her, but she was never afraid of him. RP at 126.
¶ 9 Thomas testified that Bonds had told him to come to her apartment to pick up his clothes the morning of the incident. He knocked and when no one answered, he entered through a window as he usually did if she was not home. As Thomas was taking his clothes out of the closet, Bonds awoke and told him that he could not take his belongings unless he paid some of the bills. Bonds then grabbed some clothes from his arms. When Thomas said he was taking *1267 them to his new girlfriend's house, Bonds became upset and started clawing at his face. Thomas pushed her away and she fell near the bed. As she started to get back up, Thomas walked into the living room, picked up his clothes, and left.
¶ 10 Officer Linsue Peterson testified that while she was at the scene, Fletcher answered her cell phone 10 to 15 times. During one call, Fletcher handed the phone to Peterson saying, "[T]his is Cory and he wants to talk to you." RP at 179. Peterson identified herself as a police officer and asked who she was speaking to. When the prosecutor asked whether Thomas told her anything, Peterson responded:
No. He just said, "What do you want," and I said, "Well, I was handed the phone and told you wanted to speak to me." That was pretty much the conversation. "I don't want to talk to you," and I said, "Okay."
RP at 179-80.
¶ 11 The jury convicted Thomas of fourth degree assault, second degree assault, and telephone harassment.

ANALYSIS

I. Prosecutorial Misconduct
¶ 12 To prevail on a claim of prosecutorial misconduct, a defendant must show improper conduct that prejudiced him. State v. Weber, 159 Wash.2d 252, 270, 149 P.3d 646 (2006), cert. denied, ___ U.S. ___, 127 S.Ct. 2986, 168 L.Ed.2d 714 (2007). A defendant establishes prejudice by demonstrating a substantial likelihood that the misconduct affected the jury's verdict. Weber, 159 Wash.2d at 270, 149 P.3d 646. If the defendant fails to object, he waives the issue unless the misconduct was so flagrant or ill-intentioned that it caused prejudice that the court could not cure by admonishing the jury. Weber, 159 Wash.2d at 270, 149 P.3d 646 (quoting State v. Stenson, 132 Wash.2d 668, 719, 940 P.2d 1239 (1997)). We measure possible prejudice by considering the strength of the State's case. See State v. Avendano-Lopez, 79 Wash.App. 706, 712, 904 P.2d 324 (1995).
¶ 13 Thomas argues that the prosecutor committed misconduct by eliciting from Officer Peterson testimony that Thomas did not want to talk with her and then arguing in closing:
"Hello? Yeah, I don't want to talk to you." He's just been accused of a crime. I mean, he knows that that's what's going on. The cops showed up there for a reason. "I don't want to talk to you. I don't want to talk to you [about] my story. I don't want to say anything. I'm done." Click. Calls back. Calls back. Calls back. Why? He doesn't want to talk to the cops.
RP at 311.
¶ 14 Thomas also points to the following from the prosecutor's closing argument about Officer Peterson's testimony:
Officer Peterson gets there, hears Danielle on the phone. First observation: "Corey, she's not your girl any more." That's the first thing she hears about this incident, upon arriving. Went inside, saw Lavisha bloody, beat up, blood everywhere. And the defendant keeps calling, keeps calling. Won't talk to Officer Peterson.

RP at 312 (emphasis added).
¶ 15 Finally, Thomas complains about the prosecutor's argument that although Thomas knew the police were at Bonds's apartment, he "fled" rather than returning to deny Bonds's accusations to the police. Br. of Appellant at 22; RP at 324.
¶ 16 Thomas reasons that these comments on his pre-arrest silence violated his rights to due process and against self-incrimination. The State responds that (1) Officer Peterson's testimony was a mere reference to Thomas's silence, not a comment on it, and (2) the prosecutor's remarks in closing argument properly used Thomas's silence solely to impeach his credibility.
¶ 17 The use of pre-arrest silence as substantive evidence of guilt implicates the Fifth Amendment to the United States Constitution and article I, section 9 of our Washington Constitution.[1]State v. Easter, *1268 130 Wash.2d 228, 235, 922 P.2d 1285 (1996). A defendant has the right to remain silent both before and after arrest to spare him "`from having to reveal, directly or indirectly, his knowledge of facts relating him to the offense or from having to share his thoughts and beliefs with the Government.'" Easter, 130 Wash.2d at 241, 922 P.2d 1285 (quoting Doe v. United States, 487 U.S. 201, 213, 108 S.Ct. 2341, 101 L.Ed.2d 184 (1988)).
¶ 18 Where the trial court admits evidence of pre-arrest silence, the question remains whether the State used it as evidence of the defendant's guilt. See State v. Lewis, 130 Wash.2d 700, 707, 927 P.2d 235 (1996). The Lewis court noted that "[m]ost jurors know that an accused has a right to remain silent and, absent any statement to the contrary by the prosecutor, would probably derive no implication of guilt from a defendant's silence." Lewis, 130 Wash.2d at 706, 927 P.2d 235. A mere reference to silence that is not a "comment" is therefore not reversible error absent a showing of prejudice. State v. Sweet, 138 Wash.2d 466, 481, 980 P.2d 1223 (1999) (quoting Lewis, 130 Wash.2d at 706-07, 927 P.2d 235). The critical distinction is whether the State uses the accused's silence to its advantage, either as evidence of guilt or to suggest to the jury that the silence was an admission of guilt. Lewis, 130 Wash.2d at 707, 927 P.2d 235.
¶ 19 In Easter, a police officer testified that the defendant was a "smart drunk" because he was evasive and "wouldn't talk." Easter, 130 Wash.2d at 233, 922 P.2d 1285. The court held that the State elicited this testimony to insinuate that Easter was guilty and therefore committed error, particularly where the prosecutor used the "smart drunk" theme in closing argument. Easter, 130 Wash.2d at 242-43, 922 P.2d 1285. In Lewis, on the other hand, the court found no such insinuation where the officer testified that the accused had told him that nothing happened, the officer did not testify that Lewis failed to make appointments, and the prosecutor did not argue that Lewis's failure to do so was evidence of his guilt. Lewis, 130 Wash.2d at 706, 927 P.2d 235.
¶ 20 Here, Officer Peterson testified that after she identified herself on the cell phone, Thomas responded, "What do you want," and "I don't want to talk to you." RP at 179-80. She testified that "[t]hat was pretty much the conversation." RP at 180. This was no more than a passing reference to Thomas's silence.
¶ 21 But in closing argument, the prosecutor turned Officer Peterson's testimony into more than a passing reference to Thomas's decision not to talk with the officer. The prosecutor emphasized that although he had been accused of a crime, Thomas would not return to tell his story, "[w]on't talk to Officer Peterson," "doesn't want to talk to the cops," and "didn't go back" to explain that Bonds had scratched his face. RP at 312, 324. These comments plainly conveyed the message that if Thomas was not guilty, he would have returned to the crime scene to tell his side of the story.
¶ 22 The State argues, however, that it properly used Thomas's silence to impeach his exculpatory testimony. In particular, the State reasons that the prosecutor was simply impeaching Thomas's testimony that he did not call as many times as the State contended, that he did not threaten anybody, and that he was never on the phone with Officer Peterson.
¶ 23 Some of the prosecutor's comments point only to "how many times [Thomas] called and how he was threatening and trying to threaten the witnesses." Br. of Respondent at 14. For example, the prosecutor's argument that "[c]alls keep coming. . . . He calls back. Calls back." RP at 311. And that Thomas said to Fletcher, "`Shut your mouth.' . . . `I just finished with you once. I'll do it again, if I have to.'" RP at 311. But *1269 the prosecutor went beyond impeaching Thomas's story about the number and nature of the phone calls. He described Thomas's statements as "[y]eah, I don't want to talk to you" and "I don't want to talk to you [about] my story" and his motive for them as "[h]e's just been accused of a crime. I mean, he knows that that's what's going on. The cops showed up there for a reason." RP at 311. Like the comments in Easter, the prosecutor's argument plainly invited the jury to infer Thomas's guilt from his refusal to talk with Officer Peterson and to return to the scene to tell the police his story.
¶ 24 An impermissible comment on the defendant's silence is a constitutional error. Easter, 130 Wash.2d at 242, 922 P.2d 1285; State v. Slone, 133 Wash.App. 120, 127 n. 5, 134 P.3d 1217 (2006), review denied, 159 Wash.2d 1010, 154 P.3d 918 (2007). Thus, the State bears the burden of showing that it was harmless. To do so, the State must convince us beyond a reasonable doubt that any reasonable jury would have reached the same result absent the error, and we must find the untainted evidence so overwhelming that it necessarily leads to a finding of guilt. Easter, 130 Wash.2d at 242, 922 P.2d 1285.
¶ 25 The State has not carried its harmless error burden. Bonds first told the police that Thomas assaulted her. She then recanted before trial, explaining that she sustained her injuries when she fell. At trial, she again changed her story, admitting that some parts of her recanting letter were not accurate. And she testified that she and Thomas had "tussled" before but that Thomas had never hurt her and that she was not afraid of him. Thomas testified that Bonds attacked him first, scratched his face, and then fell near the bed. Given these credibility issues, we cannot find the error harmless beyond a reasonable doubt. We reverse Thomas's conviction for second degree assault and fourth degree assault.
¶ 26 We turn now to issues likely to arise on retrial or that would also require us to reverse.
¶ 27 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.
We concur: HOUGHTON, C.J., and VAN DEREN, J.
NOTES
[1] Use of pre-arrest silence does not implicate due process principles because it lacks the same "implicit assurance" from the State about its punitive effect in future proceedings as does post-arrest silence. State v. Easter, 130 Wash.2d 228, 235-36, 922 P.2d 1285 (1996). Nonetheless, the right against self-incrimination is liberally construed to prohibit the State from eliciting comments from witnesses or from making closing arguments relating to a defendant's silence that infer guilt from such silence. Easter, 130 Wash.2d at 236, 922 P.2d 1285 (citing Miranda v. Arizona, 384 U.S. 436, 468 n. 37, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)); see also State v. Fricks, 91 Wash.2d 391, 396, 588 P.2d 1328 (1979).