
# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | ) No. 71756-1-I |
| Respondent, | ) |
| | ) DIVISION ONE |
| v. | ) |
| | ) UNPUBLISHED OPINION |
| ELMER ANDREWS VILLAFUERTE, | ) |
| Appellant. | ) FILED: July 27, 2015 |

APPELWICK, J. — Villafuerte appeals from his conviction for assault in the second degree (domestic violence). He contends that an improper comment on his constitutional right to silence and prosecutorial misconduct violated his right to a fair trial. We affirm Villafuerte's conviction and remand only to permit the trial court to strike or clarify two sentencing conditions.

## FACTS

At about 7:00 p.m. on July 24, 2013, Teresa Coalman was driving with her husband near the Space Needle when she saw a young woman, later identified as Christelle Villafuerte, trying to flag her down. Coalman asked her husband to stop the van and then rolled down the window. Christelle was visibly upset and asked to use Coalman's cell phone. Christelle repeatedly said that "he choked me."

After Coalman got out of the van, Christelle said that her husband, Elmer Villafuerte, had choked her. When Coalman asked where her husband was,

Christelle pointed down the sidewalk to a man wearing jeans and a tee shirt. The man then ran away. Coalman called 911.

While Coalman was speaking with the 911 operator, Christelle told Coalman that Villafuerte had choked and hit her after she grabbed his shirt. Christelle pointed to the left side of her face, but Coalman did not see any physical injuries.

Seattle Police Officer Daljit Gill responded to the 911 call. Christelle, who was hysterical and crying, blurted out, "he choked me, he choked me." Gill called for a medic.

Christelle identified Villafuerte as the assailant, and Gill broadcast Villafuerte's name and description. Christelle also gave Gill her husband's cell phone number. Gill dialed the number, and Villafuerte answered, acknowledging that he was nearby.

Gill then used a ruse in an effort to persuade Villafuerte to return to the scene and provide more information. Gill told Villafuerte that she would have to arrest Christelle if she did not find out anything more about the incident. Villafuerte told Gill not to arrest Christelle and that Christelle had not done anything wrong. Gill had no further contact with Villafuerte. Other officers looked for Villafuerte, but did not find him.

Shane Kidwell, an emergency medical technician with the Seattle Fire Department, contacted Christelle at about 8:00 p.m. Christelle was distraught, but had no life threatening injuries. Christelle told Kidwell that Villafuerte had "grabbed her neck" and demonstrated by grabbing her neck with one hand. Kidwell noticed some minor abrasions to her neck, but the skin was not broken and there was no

blood. Christelle indicated she was not experiencing any pain and declined any further treatment.

Christelle gave a recorded statement shortly after the police arrived. She stated that Villafuerte had choked and slapped her before running off. She indicated that she had difficulty breathing when Villafuerte choked her and that the choking lasted for at least 10 seconds.

At trial, Christelle testified that at the time of the incident, she and Villafuerte had been together for several years and had two young children. Christelle attempted to minimize the severity of Villafuerte's conduct and had difficulty recalling what she had said immediately after the assault.

Christelle acknowledged that her relationship with Villafuerte had its "[u]ps and downs" and that both she and Villafuerte had issues with "anger." In 2012, Christelle was arrested for slapping Villafuerte, but the charge was later dropped. Christelle reluctantly admitted that Villafuerte might have assaulted her during earlier incidents. Christelle repeatedly expressed concern about the difficulty of raising the couple's children by herself. She hoped that "this would all just go away." She acknowledged that she wanted "to protect him."

On the night of the incident, Christelle and Villafuerte attended a party near the Seattle Center that her employer hosted. Christelle believed that both she and Villafuerte had drunk too much. At some point, Villafuerte left the party in anger, believing that Christelle was flirting with a coworker.

Christelle followed Villafuerte outside and tried to explain that she had not been flirting. The two began arguing. Christelle recalled that when Villafuerte

refused to go home, she began "pulling on" his side and shirt. Villafuerte then "kind of like pushed me away . . . like towards my chest area, by my neck, too." Christelle was "shocked," and Villafuerte ran away.

Christelle started crying and flagged down Coalman's van. She maintained that she did not really want the police to become involved at that point, "but in the back of my mind I kind of knew that was going to happen especially with me flagging down that lady."

Christelle also suggested that the police had manipulated her into accusing Villafuerte:

> I told them that I had gotten in an argument with my husband and that things got physical and that he ran off and I was chasing after him. And I told them that I felt like he grabbed me over here, I don't know. And then I remember the cops saying that, oh, did he choke you because if he choked you that's a felony. And that shocked me right there. I wasn't expecting that. And he just asked if he had grabbed my neck. And I was like, yeah, I think he did, I think he grabbed [m]y neck.
>
> But at the same time I felt like that's not really what happened, like I don't even know what happened because I was still in shock. I was still emotional, I was still angry and sad, so I don't know. I felt like the cops were just trying to get me to say that he choked me, like choked me choked me, strangled me. I remember him asking me how long his hands were around my neck or around that area. I don't remember what I said after that.

During cross examination, Christelle conceded that her memory of the incident was "imperfect." She agreed with defense counsel that Villafuerte had not slapped or choked her.

The State charged Villafuerte with assault in the second degree by strangulation – domestic violence. See RCW 9A.36.021(1)(g). The jury found

-4-

Villafuerte guilty as charged and returned a special verdict of domestic violence. The court imposed a standard range term of six months, with three months to be served in jail and three months in work release.

## DISCUSSION

### I. Comment on Right to Silence

Prior to trial, Villafuerte moved to exclude portions of Officer Gill's testimony about her telephone conversation with Villafuerte shortly after the alleged assault. Defense counsel conceded that evidence indicating Villafuerte was in the vicinity and said that Christelle had done nothing wrong was relevant and admissible. But, counsel argued that any testimony that Villafuerte failed to return to the scene and give his account of the alleged assault would violate his constitutional right to prearrest silence. The court excluded any testimony that Gill told Villafuerte she would arrest Christelle if he did not return to the scene and that he repeatedly said he would return, but never did.

At trial, Officer Gill testified that she called Villafuerte shortly after the alleged assault. Gill told Villafuerte that she might have to arrest Christelle for assaulting him. Villafuerte responded that Christelle "didn't do anything, don't do that." Gill wanted Villafuerte to come back so that she could "get more information about what had happened." She explained that the additional information was important because "[t]here's two sides to every story, and I wanted to get his side as well." Gill added that officers had unsuccessfully looked for Villafuerte after the telephone call and that she had no further contact with him.

Villafuerte argues that the evidence of Gill's desire to get his "side of the story" and the lack of any further contact constitutes a comment on his silence because it clearly implies that innocent suspects "will tell their side of the story to the police." We disagree.

Under both the state and federal constitutions, the State may not comment on a defendant's Fifth Amendment exercise of the right to remain silent, including a defendant's prearrest silence. See State v. Easter, 130 Wn.2d 228, 235, 922 P.2d 1285 (1996); State v. Gregory, 158 Wn.2d 759, 839, 147 P.3d 1201 (2006); State v. Lewis, 130 Wn.2d 700, 705, 927 P.2d 235 (1996). An impermissible comment on silence occurs when the State uses the defendant's silence "as substantive evidence of guilt or to suggest to the jury that the silence was an admission of guilt." Lewis, 130 Wn.2d at 707. The primary concern is "whether the prosecutor manifestly intended the remarks to be a comment on that right." State v. Crane, 116 Wn.2d 315, 331, 804 P.2d 10 (1991). So long as the focus of the questioning or argument " 'is not upon the exercise of the constitutional right itself,' " the inquiry or argument does not infringe upon a constitutional right. Gregory, 158 Wn.2d at 807 (quoting State v. Miller, 110 Wn. App. 283, 284, 40 P.3d 692 (2002)).

Here, contrary to Villafuerte's assertions, Gill's testimony did not imply that his failure to contact her—or the officers' failure to find him later that evening—was an admission of guilt. Gill did not confront Villafuerte with an accusation of guilt or suggest that he needed to return to refute a suspicion of guilt. See, e.g., State v. Keene, 86 Wn. App. 589, 594, 938 P.2d 839 (1997) (police detective told defendant

that she would turn matter over to prosecuting attorney if she did not hear from the defendant about abuse allegations).

Nor did Gill suggest that Villafuerte refused to talk to her, refused to respond to an invitation, or failed to appear after having agreed to talk to the police. See State v. Lewis, 130 Wn.2d at 706. Finally, Villafuerte concedes that the deputy prosecutor did not refer to Gill's contact with Villafuerte during closing argument or suggest during other questioning that Villafuerte's failure to contact Gill was evidence of guilt. See State v. Thomas, 142 Wn. App. 589, 596, 174 P.3d 1264 (2008) (during closing argument, prosecutor repeatedly emphasized that the defendant did not want to talk to the investigating officers or return to the crime scene).

Viewed in context, Gill's brief testimony describing her call with Villafuerte and the officers' failure to find him that evening did not imply that Villafuerte was guilty because he did not contact the police. See State v. Burke, 163 Wn.2d 204, 216, 181 P.3d 1 (2008) (statement will not be considered a comment on the right to remain silent, if " 'standing alone, [it] was so subtle and so brief that [it] did not naturally and necessarily emphasize defendant's testimonial silence.' " (internal quotation marks omitted) (alterations in original) (quoting Crane, 116 Wn.2d at 331).

II.   Prosecutorial Misconduct

Villafuerte contends that prosecutorial misconduct during rebuttal closing argument violated his right to a fair trial.  He argues that the deputy prosecutor misstated the State's burden of proof by telling that jury that its job was "to figure out what happened here."

A defendant claiming prosecutorial misconduct bears the burden of establishing that the challenged conduct was both improper and prejudicial. State v. Cheatam, 150 Wn.2d 626, 652, 81 P.3d 830 (2003). Prejudice occurs only if "there is a substantial likelihood the instances of misconduct affected the jury's verdict." State v. Pirtle, 127 Wn.2d 628, 672, 904 P.2d 245 (1995). We review misconduct claims in the context of the total argument, the evidence addressed, the issues in the case, and the jury instructions. State v. Boehning, 127 Wn. App. 511, 519, 111 P.3d 899 (2005).

During rebuttal, the deputy prosecutor responded to defense counsel's arguments that Christelle's trial testimony was more credible:

> That was a pretty amazing story. Unfortunately, none of it was true. We heard no evidence to believe the story you just heard. The whole argument was that Christelle, after this incident took place, wanted to get Elmer into trouble so she decided to make up a story about him choking her and then report it to the police so he would get into trouble.
>
> There was no evidence of that. Christelle didn't say anything about wanting to get him into trouble, about making the story up. She told you the opposite. . . .
>
> . . . .
>
> You heard today from Teresa Coalman the first thing Christelle said was, he choked me, he choked me, he choked me. You heard the 911 call or a portion of the 911 call when Christelle says in her own words, I grabbed his shirt, he choked me and hit me in the face before police arrived. You heard from Officer Gill who said I asked her what happened. Christelle told me he choked me, he choked me.
>
> What she said here wasn't all the truth. You know that. What else she said here is she just wants this to go away, she wants to protect him, she loves him, she wants him to be there for her and for the children. That's pretty noble that she's willing to forgive him after all of this. She's willing to stick in this relationship. But her decision is not

your decision. <u>Your decision, your job is to figure out what happened here</u>.

(Emphasis added.) Defense counsel objected on the basis of "[i]mproper argument." The trial court overruled the objection, but directed the jury "to follow the Court's instruction on the law."

Villafuerte argues that telling the jury that its job "is to figure out what happened" impermissibly mischaracterized the State's burden of proof. "Telling the jury that its job is to 'speak the truth,' or some variation thereof, misstates the burden of proof and is improper." <u>State v. Lindsay</u>, 180 Wn.2d 2d 423, 437, 326 P.3d 125 (2014). Rather, "a jury's job is to determine whether the State has proved the charged offenses beyond a reasonable doubt." <u>State v. Emery</u>, 174 Wn.2d 741, 760, 278 P.3d 653 (2012).

During their closing arguments, both the deputy prosecutor and defense counsel focused primarily on factors that the jury should consider in assessing the relative credibility of Christelle's trial testimony and her statements shortly after the alleged assault. Viewed in context, the deputy prosecutor's reference to the jury's "job" appears to have been a proper, if inartful, attempt to persuade the jury that Christelle's immediate postassault statements were more credible than her trial testimony. The prosecutor has broad discretion during closing argument to comment on the credibility of witnesses based on the evidence. <u>See</u> <u>State v. Stenson</u>, 132 Wn.2d 668, 727, 940 P.2d 1239 (1997)

But, to the extent that the comment might have mischaracterized the jury's proper role, any error was harmless. The deputy prosecutor's arguments repeatedly

focused on the evidence and factors that the jury could properly consider when assessing credibility. He properly identified the State's burden of proof and immediately after the challenged comment, the trial court reminded the jury to follow the law as set forth in the court's instructions. Finally, in reaching its verdict, the jury considered not only Christelle's trial testimony, but also the testimony of the witnesses who spoke with Christelle immediately after the assault, the 911 recording, and Christelle's recorded statement. Under the circumstances, there is no reasonable likelihood that the deputy prosecutor's brief and isolated reference affected the jury's assessment of credibility or the outcome of the trial.

### III. Cumulative Error

Villafuerte contends that even if no single error merits reversal, the cumulative effect of the comments on his right to silence and prosecutorial misconduct violated his right to a fair trial. Because Villafuerte has not demonstrated an accumulation of errors, the cumulative error doctrine does not apply. See In re Pers. Restraint of Lord, 123 Wn.2d 296, 332, 868 P.2d 835, 870 P.2d 964 (1994).

### IV. Consumption of Non-Prescribed Drugs

Villafuerte contends that the trial court exceeded its authority in ordering, as a condition of community custody, that he not consume "any . . . non-prescribed drugs." The trial court may only impose crime-related conditions if there is evidence that the prohibited conduct was involved in the crime of conviction. RCW 9.94A.030(10); State v. Warnock, 174 Wn. App. 608, 612, 299 P.3d 1173 (2013). We review the trial court's authority to impose a community custody condition de novo. Id. at 611.

The State concedes that legal, non-prescribed drugs were not involved in Villafuerte's offense, but contends that the trial court used the term merely as a "synonym for controlled substances." But, that would render the prohibition superfluous, as another provision of Villafuerte's judgment and sentence expressly prohibited his possession or consumption of controlled substances "except pursuant to lawfully issued prescriptions."

The State also contends that Villafuerte's preenforcement challenge is not yet ripe for review. We disagree. The community custody condition is a final action, the issues raised are primarily legal, and no further factual development is necessary. Moreover, the condition purports to restrict Villafuerte's conduct immediately upon release. See State v. Cates, No. 89965-7, slip. op. at 3-5 (Wash. July 2, 2015). Villafuerte's challenge is ripe for review.

We remand with direction to the trial court to strike or clarify the condition.

V.    Chemical Dependency Evaluation and Treatment

The trial court checked a box on the judgment and sentence finding that Villafuerte "has a chemical dependency" (alcohol) and ordered him to participate in "substance abuse treatment." See RCW 9.94A.607(1) (when the court finds that the defendant has a "chemical dependency" that contributed to the offense, the court may order participation in rehabilitative programs). Villafuerte contends that there is no evidence to support the finding of a chemical dependency and that, in any event, treatment must be limited to alcohol treatment. Villafuerte also argues that the trial court erred in ordering chemical dependency treatment without first requiring the

Department of Corrections to complete a chemical dependency screening report or "specifically waiv[ing]" the requirement.  See RCW9.94A.500.

Christelle testified that before the assault, "I guess we both drank too much." She explained that this was "about two . . . or three" glasses of champagne.  The State suggests that because alcohol consumption and chemical dependency are essentially the same for purposes of RCW 9.94A.607, the evidence was sufficient to support a finding that a chemical dependency contributed to Villafuerte's offense. We have rejected an analogous argument.  See State v. Warnock, 174 Wn. App. 608, 613, 299 P.3d 1173 (2013) (rejecting State's argument that "trial court's oral finding that alcohol contributed to Warnock's offense was equivalent to a finding under RCW 9.93A.607(1) that a chemical dependency contributed to his offense").

The State concedes, however, that "there was no evidence that anything other than alcohol contributed to Villafuerte's offense."  Accordingly, we remand with directions to amend the judgment and sentence to impose alcohol evaluation and recommended treatment consistent with the evidence and statutory requirements.

We affirm Villafuerte's conviction.  We remand only to permit the trial court to strike or amend the challenged sentencing conditions.

_Appelwick, J._

WE CONCUR:

_Spearman, C.J._                     _Cox, J._