## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  58412-3-II |
| Respondent, | |
| v. | |
| EDWARD RAYMOND WARD, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — Following a jury trial, Edward R. Ward appeals his convictions for two counts of first degree child molestation.  Specifically, Ward argues that he received ineffective assistance of counsel and that the trial court violated his right to present a defense when it excluded certain evidence.  Ward also argues that the trial court abused its discretion when it imposed lifetime community custody conditions that impact his right to parent his minor child.

Even assuming without deciding that Ward's counsel performed deficiently as alleged, Ward cannot establish that defense counsel's deficient performance prejudiced him.  Thus, Ward's ineffective assistance of counsel claims fail.  With regard to the trial court's evidentiary rulings, because the trial court properly excluded the challenged evidence and because other defense theories were available to Ward, the trial court did not violate Ward's right to present a defense. Accordingly, we affirm Ward's convictions.  Finally, because the record shows that the trial court failed to conduct an inquiry regarding the community custody conditions affecting Ward's right to parent his minor child, we remand to the trial court for reconsideration consistent with this opinion.

FACTS

A.   BACKGROUND

T.V.1 and T.V.2,[1] born in September 2005, are twin sisters. They live with their mother, Jocelyn White,[2] stepfather, Frederick (Fred) White, and younger brother. T.V.1 and T.V.2 also have two older siblings, Jhermaine and Mark. Fred became part of T.V.1 and T.V.2's lives when they were three years old; they both consider him their father and call him "'dad.'" 6 Verbatim Rep. of Proc. (VRP) (May 8, 2023) at 33.

Jocelyn's sister, Bernadette Ward, lived nearby with her husband, Ward; her son, Ethan V.; and Bernadette and Jocelyn's mother, Dominga Vejano. Bernadette and Ward also have a son together, who is approximately eight or nine years younger than T.V.1 and T.V.2.

When T.V.1 and T.V.2 were in kindergarten and first grade, Jocelyn would drop them off at Bernadette's house in the mornings. From Bernadette's house, T.V.1 and T.V.2 would catch the bus to school. After school, the girls would return to Bernadette's house, where Dominga would watch them until Jocelyn picked them up after work in the evenings. T.V.1 and T.V.2 would play with Ethan, who was three years older than the girls. Generally, the two families were very close.

---

[1] The sisters share the same initials. The charging documents and both parties use T.V.1 and T.V.2 to distinguish between the two.

[2] This case involves members of an extended family, and several members share the same last name. Thus, this opinion will generally refer to individuals by their first name to avoid confusion; no disrespect is intended.

1.      Incidents Involving T.V.1

In 2012, Jocelyn and Fred took a two-week trip to the Philippines. T.V.1 and T.V.2 stayed at Bernadette's house. The girls were six years old at the time.

While T.V.1 and T.V.2 were staying at Bernadette's house during their parents' 2012 trip, Ward carried T.V.1 into his bedroom upstairs. It was not unusual for T.V.1 to be in Ward's room as the children in the household often watched movies there. On this occasion, however, Ward sat on the bed and sat T.V.1 on his lap. Ward unzipped his pants and put T.V.1's hand on his penis. Ward then moved T.V.1's hand up and down his penis. When T.V.1 tried to move her hand away, Ward kept it there and told her it was "okay." 6 VRP (May 8, 2023) at 58.

T.V.1 told Ward she wanted to go to the bathroom. Ward pointed T.V.1 to his bathroom adjoining the bedroom. T.V.1 began to walk towards the bathroom but then ran downstairs instead. T.V.1 ran to and hugged Dominga, who was downstairs with Bernadette. Ward then came downstairs "laughing" and said that they had been "just playing around." 6 VRP (May 8, 2023) at 60. T.V.1 did not fully understand Ward's actions, so she did not tell Dominga or Bernadette what had happened.

On another occasion prior to fifth grade, T.V.1 and T.V.2 were watching a movie with Ward on his bed. Ward wrapped his legs around T.V.1 and made a "tightening and untightening" motion around her leg. 6 VRP (May 8, 2023) at 63. T.V.1 could feel his penis "bulging" through his pants. 7 VRP (May 8, 2023) at 53.

2.      Incidents Involving T.V.2

Prior to Jocelyn and Fred's 2012 trip, while T.V.2 was downstairs with Dominga, Ward asked T.V.2 if she wanted to watch a movie in his room. This was not an unusual request from

3

Ward, and she agreed. Bernadette was not at home. T.V.2 laid down beside Ward on his bed to watch the movie. The movie featured sex scenes, during which T.V.2 would cover her eyes.

As with T.V.1, Ward grabbed T.V.2's hand and put it on his penis. Ward moved T.V.2's hand up and down on his penis. T.V.2 was aware she touched bare skin. Ward told T.V.2, "'It's okay.'" 8 VRP (May 9, 2023) at 21. After the movie ended, T.V.2 went back downstairs. Ward acted like nothing happened.

Then, during Jocelyn and Fred's 2012 trip, Ward again asked T.V.2 if she wanted to watch a movie in his room. While in his room, Ward unzipped his pants, grabbed T.V.2's hand, and attempted to place it down the front of his pants. T.V.2's hand caught on the zipper, and she told him that her hand hurt. Ward then released her hand. On that occasion, T.V.2 never touched Ward's penis.

T.V.2 also testified to other incidents where Ward wrapped his legs around T.V.2, rubbed against her leg, and appeared to masturbate. Ward engaged in this conduct with T.V.2 several times over the years.

In 2015, Jocelyn and Fred took a second trip to the Philippines. For that trip, T.V.1 stayed with Bernadette while T.V.2 stayed with another aunt. However, T.V.2 was at Bernadette's house, and Ward again asked both T.V.1 and T.V.2 to watch a movie with him in his room. They agreed. T.V.1 later left the room, and after she left, Ward pressed his penis against T.V.2 and rubbed himself against her leg.

T.V.2 told Bernadette about Ward's conduct after one of the first times he had her touch him. Bernadette became upset, told T.V.2 to not speak of Ward in that way, and then whipped T.V.2 with some bamboo sticks. Following her interaction with Bernadette, T.V.2 did not speak

with anyone about Ward because she did not think anyone would believe her. After T.V.2 turned 12, there were no more incidents with Ward.

3.      Disclosures

Around fifth grade, T.V.1 and T.V.2 talked and realized that Ward had engaged in the same conduct with both of them. They decided to keep it a secret, in part because they felt that telling others would "cause too much conflict." 8 VRP (May 9, 2023) at 44.

Beginning around 2012, Fred began to notice changes in T.V.1's and T.V.2's behaviors. They stopped bathing and increasingly kept to themselves, and their behaviors became more pronounced over time.

In late 2019, Fred, who was working as a delivery driver, took T.V.1 and T.V.2 with him one evening to deliver packages. Fred intended to talk with the girls and ask what was bothering them. At the time, T.V.1 and T.V.2 were about to enter high school.

Fred mentioned to T.V.1 and T.V.2 that boys were going to figure more prominently in their lives and that they "shouldn't let anyone disrespect [them] or let anyone touch [them] in any way that [they] wouldn't be comfortable with." 6 VRP (May 8, 2023) at 70. Fred then mentioned T.V.1 and T.V.2's cousin, Ethan. Fred brought up Ethan based on an incident years earlier when Ethan allegedly exposed himself to T.V.1 and T.V.2. T.V.1 and T.V.2 immediately clarified that Ethan had never touched them; it was Ward. After T.V.1 and T.V.2 disclosed what Ward had done, Fred told them that they needed to tell Jocelyn.

T.V.1 and T.V.2 told Jocelyn about the sexual abuse. The disclosure upset Jocelyn, but they all decided they "wanted to handle it in the family" and did not intend to report Ward to law enforcement. 9 VRP (May 9, 2023) at 55.

Jocelyn told Bernadette about what T.V.1 and T.V.2 had told her. Bernadette accused T.V.1 and T.V.2 of lying. Bernadette then told Dominga about T.V.1 and T.V.2's allegations. As a result of the disclosures, Jocelyn, T.V.1, and T.V.2 no longer had contact with Bernadette, Bernadette's family, or Dominga.

Jocelyn took T.V.1 and T.V.2 to counseling. The counselor reported Ward to law enforcement based on T.V.1 and T.V.2's disclosures of sexual abuse. In 2020, both T.V.1 and T.V.2 participated in forensic interviews with Keri Arnold, a child interviewer with the Pierce County Prosecuting Attorney's Office. During the forensic interviews, both T.V.1 and T.V.2 disclosed the abuse.

B.    PROCEDURAL HISTORY

In June 2021, the State charged Ward with one count of first degree child molestation involving T.V.1 (Count 1) and one count of first degree child molestation involving T.V.2 (Count 2). The State later filed an amended information in which it added a charge of second degree child molestation involving T.V.2 (Count 3). Ward retained counsel.

A jury trial was originally set for March 2022. However, trial was continued several times for various reasons. Ultimately, trial was set to begin April 27, 2023.

1.    Defense Counsel Substitution

On April 5, 2023, the parties appeared before the trial court on defense counsel's motion to withdraw. Defense counsel explained to the trial court that he filed the motion to withdraw at Ward's request, and that he and Ward had "irrevocable differences" and could no longer communicate. VRP (Apr. 5, 2023) at 5. Defense counsel mentioned that Ward had retained new counsel, Michael Ewetuga. Defense counsel confirmed that he would work with Ewetuga and

6

provide Ewetuga with his work product regarding the case. The State objected to the motion based on the age of the case, which at the time was 644 days old.

The trial court denied the motion without prejudice, stating that Ewetuga needed to appear in court to request substitution as Ward's counsel. Two days later, the parties appeared again before the trial court on a motion to substitute; this time, both defense counsel and Ewetuga were present. In addressing the issue of substitution of counsel, the trial court stated:

> Well, I guess the issue always—usually from the State's point of view is it's going to necessitate a continuance, and is that an issue? At the moment, the only issue is whether we're going to allow substitution of counsel.
>
> Mr. Ewetuga is here. Are you going to be seeking a continuance of the trial date, which we've got now of April 27, which is ten [sic][3] days from now?
>
> [EWETUGA]: If I may, Your Honor? If the Court allows me to come in, of course, I'll be seeking a continuance because I would need time to move through the discovery—
>
> [TRIAL COURT]: Sure.
>
> [EWETUGA]: —see what has been done before now, and that's what we have. I think—
>
> [TRIAL COURT]: But you know you run the risk that the judge says no?
>
> [EWETUGA]: I do, but I'm hoping that the judge will not say no because the defense—the defendant does have the constitutional right to be, you know, fully represented.
>
> I mean, if I—if the Court allows me to come in, I would think that the Court would allow me to familiarize myself with the discovery before going to trial. So, of course, it would be—if the Court says no, there's nothing that I can do about that, but I would think that if the Court allows me to sub in, and the Court would give me time to do my due diligence.

---

[3] Trial was 20 days from this point in time.

VRP (Apr. 7, 2023) at 5-6.

The trial court expressed concern over the age of the case, stating:

> But there is, in a case that's over 600 days old, there's a very real concern about delay causing injustice in a case. The staler evidence gets, the less reliable it gets. The less reliable it gets, the less confidence we have in the outcome. So I don't mind bringing counsel in here, but only under the understanding that we're not moving the trial date.
>
>          . . . .
>
>          . . . And I'm telling you: I will approve this only on the understanding that the trial date is not going to get changed. Now, it may get changed for some other reasons beyond my control. But on the basis that counsel is not prepared? No. And I'll put that in the order.
>
>          If you guys want to be co-counsel, that's fine with me too. If counsel says, I'm not coming into the case under those circumstances, then there's no lawyer to come in and substitute.

VRP (Apr. 7, 2023) at 8-9. The trial court then gave Ward, defense counsel, and Ewetuga an opportunity to confer with one another. Afterwards, Ward, defense counsel, and Ewetuga confirmed that Ewetuga would substitute in as Ward's counsel and that Ewetuga would not move for a continuance based on the late substitution of counsel.

The trial court signed an order authorizing the substitution of counsel. The order stated in part:

> The Defendant & both new and withdrawing counsel have been advised that the appearance of new counsel so close to trial shall <u>not</u> be accepted as a reason to continue the trial. It is only on this condition that substitution of counsel is approved.

Clerk's Papers (CP) at 33 (underlining in original) (some capitalization omitted).

8

2.      Motions in Limine

At the start of trial, the trial court addressed motions in limine.

a.      Other suspect evidence

Ward's new defense counsel, Ewetuga,[4] made an oral motion to introduce other suspect evidence as part of the defense's theory of the case. Specifically, defense counsel sought to admit evidence of an alleged incident that occurred when T.V.1 and T.V.2 were four or five years old and Fred allegedly touched them inappropriately. Defense counsel did not file a written motion or other supporting briefing. The trial court instructed defense counsel to file a written motion later that day so the parties could fully address the issue.

Defense counsel then filed written motions in limine. Defense counsel wanted to introduce evidence of an "alternative perpetrator"—or testimony from Dominga that T.V.1 and T.V.2 had told her, back in 2009, that Fred touched them inappropriately during a bath. CP at 53. Dominga did not personally witness the conduct herself. The trial court asked defense counsel how the alleged incident with Fred was related to the charged conduct against Ward. Defense counsel argued it was all the same conduct.

After extensive discussion with defense counsel, the trial court denied the defense's motion to introduce evidence that Fred was a possible perpetrator. The trial court reasoned that defense counsel failed to present facts and circumstances, other than speculation, that tied Fred to the charged crimes.

---

[4] All subsequent references to "defense counsel" refer to Ewetuga.

Later, in the middle of trial, defense counsel filed a "Motion for an Order of Amendment," asking the trial court to reconsider its denial of the motion in limine to admit evidence of Fred as a possible perpetrator. CP at 210. The motion cited CrR 8.2 and CR 59(a)(1). Defense counsel argued that the State should have brought a CrR 3.6 motion to suppress regarding the issue of an alternative perpetrator. The trial court denied the motion, again reasoning that defense counsel had failed to produce any evidence connecting Fred to the conduct that Ward was charged with perpetrating against T.V.1 and T.V.2.

> b. Witness list

The State moved to exclude undisclosed witnesses or evidence. In conjunction with this motion, the State also filed a motion to compel, requesting that the trial court require defense counsel to comply with CrR 4.7(b).[5] Defense counsel had submitted an 18-person witness list, several of whom the State had never heard of before, and without any summary of the witness testimony. The trial court addressed defense counsel:

> [TRIAL COURT]: . . . [T]he defense is clearly in violation of CrR 4.7(b).
>
> [DEFENSE COUNSEL]: That's correct.
>
> [TRIAL COURT]: So how do you want to handle the fact that you have not provided any specific testimony of each witness or their names and addresses?

---

[5] CrR 4.7(b) provides in part:

> (1) Except as is otherwise provided as to matters not subject to disclosure and protective orders, the defendant shall disclose to the prosecuting attorney the following material and information within the defendant's control no later than the omnibus hearing: the names and addresses of persons whom the defendant intends to call as witnesses at the hearing or trial, together with any written or recorded statements and the substance of any oral statements of such witness.

[DEFENSE COUNSEL]: Your Honor, that actually will be made clear. My thinking was I needed to actually address the issue of motion in limine [sic] because the testimony that some of these witnesses will be giving is going to be made clear in the motion in limine, so which I will file today. And I don't think we'll have this issue after today.

And if the Court needs me to respond to the motion, I can do that. But what I just give the Court in summary is what they will be testifying to because this was prior to the present one. And these are the people who were there at the time. And I will give the prosecutor—to get out of the motion in limine, I will give the prosecutor the summary of what they will testify to.

[TRIAL COURT]: I'm going to order that you provide the State with a list of witnesses that has specific testimony that you're expecting from each witness—

[DEFENSE COUNSEL]: Yes.

[TRIAL COURT]: —by the close of business today.

[DEFENSE COUNSEL]: Okay. We can do that.

1 VRP (Apr. 27, 2023) at 9-10. The next day, defense counsel filed an "amended list of witnesses to satisfy CrR 4.7(b)." CP at 64. The witness list included 16 individuals and summaries for only some of the witnesses.

        c.       Reference to polygraph testing

The State also moved to exclude any reference to Ward having taken a polygraph test. After Jocelyn spoke with Bernadette about Ward's abuse of T.V.1 and T.V.2, Bernadette wanted all male family members to take a polygraph test. Fred refused. Ward arranged a polygraph examination for himself and later provided law enforcement with the results. Because the State was not involved with Ward's polygraph examination, the State offered Ward the opportunity to submit to a polygraph with a certified polygrapher employed by the sheriff's department.

11

However, Ward refused. At no time did the parties stipulate to the admissibility of Ward's polygraph results.

Defense counsel objected to the State's motion. Defense counsel wanted to admit evidence that Ward took a polygraph examination, without disclosing the results of the examination, while Fred refused. The trial court inquired how the evidence was relevant. Defense counsel insisted it was relevant to the defense's theory—that Ward did not commit the offenses at issue.

The State argued the evidence was inadmissible absent agreement between the parties, and any evidence that Fred refused to take a polygraph test would be prejudicial. The trial court agreed with the State and granted the motion to exclude evidence regarding a polygraph examination.

Defense counsel continued to argue the issue.

> [DEFENSE COUNSEL]: Okay. So, I will have the Court know that this case, for example, because the State is talking about proof and the rest of it, the only proof that the State has in this entire case is the testimony of the alleged victim. There's nothing else. There's no forensic, there's nothing, there's no physical examination, there's no—the authorities did not even, you know, interview some of the witnesses and the rest of it.

> And my impression of the police officer . . . is—I mean, I don't want to go into the whole thing, but I'm just surprised that the issue of evidence, you know, is being vigorously fought now, because what I'm talking about is statement of fact. It is factual. It is something that happened. It is relevant because we are going— the defense is going to be that [Fred] did what Mr. Ward is being accused of. So now we are forced to show that. We should be able to show what kind of a man we're dealing with here.

> [TRIAL COURT]: [Defense Counsel], I've made my ruling.

> [DEFENSE COUNSEL]: Yes, okay.

> [TRIAL COURT]: You can still argue that someone else did it.

> [DEFENSE COUNSEL]: I'm sorry, Your Honor. I apologize. It is because my fear now is that we are in a territory where the State is trying the case that they

have, it is their case that they brought into court based on just the statement of what some people would have said is he said/she said kind of thing. So, and I understand people are really touchy about, you know, sexual offenses and the rest of it, but we do have the right, though, and we are going to try to defend ourselves against something that we believe is—I mean, we'll get to that point. I don't want to waste the time of the Court, but I'm just surprised that as far as evidence goes, we didn't get much of anything.

[TRIAL COURT]: All right. I just will repeat my belief that the defense is still fully capable of making its defense of another suspect. You just can't do it by talking about polygraphs.

1 VRP (Apr. 27, 2023) at 19-20.

> d. Expert testimony regarding delayed disclosure

The State sought to admit expert testimony from Arnold, the child forensic interviewer, regarding delayed disclosure. Defense counsel wanted to "reserve on this one" because he wished to conduct a separate interview with Arnold in advance of her testifying because "there are just some side questions that [he] personally believe[d] that should have been asked." 1 VRP (Apr. 27, 2023) at 23. The trial court then asked, "But on the subject of delayed disclosures, do you have a position?" 1 VRP (Apr. 27, 2023) at 23. Defense counsel replied:

I actually do not because I don't know what the experts are [sic]. I don't know what they've said about delayed disclosure, so I have no position on this one. And I don't think I will have one until I do have the opportunity of talking to . . . Ms. Arnold.

1 VRP (Apr. 27, 2023) at 23.

The State then argued why Arnold's testimony regarding delayed disclosures should be admissible. Defense counsel responded:

Your Honor, I don't think there is any rule—I mean, the reason why we do what we do is even if the [S]upreme [C]ourt says something on an issue, we still have the right to disagree and make our argument and the Court can make a ruling one way or the other. But what I don't want to do is go put myself in a position where

it would be difficult to, you know, walk back—I don't know anything about the late disclosure. I'm not an expert in the field. I'm just a lawyer. So if it is something that I need to consult with another expert for, then I will do it. But we've put the State on notice that we would like to talk to their expert witness. They've been gracious enough to say that we can do that. And so until that is done, I don't think it will be fair for the Court to make me say something if I feel that I'm not— that's not my feeling.

[TRIAL COURT]: But you're a lawyer who's expected to be prepared for trial.

[DEFENSE COUNSEL]: That's correct. And I am. But I want to talk to the State witness, which is one of the preparation is for me to talk to the State's witness, and they have agreed that they will provide the witness sometime next week, whenever that is, they will talk. But I can't—I have some questions that I need to ask.

[TRIAL COURT]: I think you're sort of conflating two issues. I'm going to grant [this motion] because I do agree, based on the authorities cited by the State, that this type of evidence has been found to be admissible. But that does not preclude [Defense Counsel] from asking additional questions in a separate interview. I think you're fine to do that.

1 VRP (Apr. 27, 2023) at 24-26.

    e.       T.V.1's and T.V.2's identification of Ward

In the State's motion in limine 10, the State requested to "admit [T.V.1's and T.V.2's] statement of identification of [Ward] as their abuser." CP at 46. The State also anticipated that other witnesses would testify to the twins' identification of Ward.

In response, defense counsel stated:

There's an issue of fact. That's actually what we are contending. . . .

    . . . .

Because as a matter of fact, there is evidence of something that happened in this case that was done by somebody else that was then imputed to another person, . . . and we are going to call a witness to that fact. So it is something that I think goes beyond an issue that will be handled at this stage of the proceedings, is what I

14

think. As long as the person is not saying that we cannot call a witness with regard to that.

So the defense is not going to—we're just going to leave this to the Court because the way I see it, this is something that should be decided after evidence has been provided to support the accusation that somebody did something. I believe that's an issue of fact, that it should be left for the jury is what I'm saying.

So I agree to statements about identification. I mean, they are going to testify, they are going to identify the person that they said had did [sic] anything to them, and the jury then will make a decision one way or the other. So I don't think it's actually something that—I don't think this is a motion in limine issue. But that's my take on it.

1 VRP (Apr. 27, 2023) at 27-28.

The State replied:

I think [Defense Counsel] is confusing the motion in limine with the request. Let me back up. I think he's confusing my request to be able to elicit testimony from witnesses that these victims identified Mr. Ward as their abuser. I think [Defense Counsel] is thinking I'm asking that he agree that his client is the abuser, which is quite different than the motion in limine and the supporting authority for that.

So I think there's a confusion on [Defense Counsel's] part about what I'm asking. I'm simply asking that the witnesses be able to say that [T.V.1] and [T.V.2] identified Mr. Ward as their abuser.

1 VRP (Apr. 27, 2023) at 28. Defense counsel insisted he was not confused. Defense counsel stated:

I'm not confused at all. This is written in English. It says "Admit victim statement of identification of the defendant as the abuser in this matter." So who is to—for the Court to admit it or for me to admit that. I mean, I don't—maybe that is where my confusion stems from.

[TRIAL COURT]: These are motions in limine to the Court. So do you want me to grant it or deny it?

[DEFENSE COUNSEL]: I actually have no position. I will leave that to the Court.

15

1 VRP (Apr. 27, 2023) at 28-29.

3.      Trial

The parties proceeded to a multi-day jury trial.  Several witnesses, including T.V.1 and T.V.2, testified to the facts described above.

a.      Impeachment

During the defense's cross-examination of Fred, defense counsel struggled to differentiate between impeaching a witness and refreshing a witness's recollection.  The trial court excused the jury.  The trial court and defense counsel then engaged in the following exchange:

> [DEFENSE COUNSEL]: . . . So the thing is, if I cannot do my cross-examination that—if the witness is going to sit there, look at the transcript, and flat out say that was what he said, am I allowed to read it out to them, what he said?
>
> [TRIAL COURT]: Well, the problem is that you started by asking to refresh the witness's recollection.  That's one procedure.  But if you're going to impeach a witness, that's a different procedure.
>
> So you kind of need to decide how you're going to handle this.
>
> [DEFENSE COUNSEL]: I cannot—which—now I'm confused.  And the reason why I'm confused is if the witness is going to look at his own answer and then say, sitting there, that that was not what he said, I think I should have the right to read it to him so that a jury will know what he said because he's not saying it.
>
> [TRIAL COURT]: If you are now impeaching a witness, that's a different procedure. . . .
>
> . . . .
>
> . . . So follow the impeachment procedure.
>
> [DEFENSE COUNSEL]: . . . I'm sorry.  I forgot how.

9 VRP (May 9, 2023) at 69-70.

The trial court then instructed defense counsel on how to impeach a witness. The next day, during Fred's cross-examination, defense counsel again failed to distinguish between impeachment and refreshing a witness's recollection. The trial court excused the jury and again attempted to instruct defense counsel on the proper steps. Defense counsel stated:

> So, okay. Then maybe I will choose the—I think I will choose the impeachment part of it and then the State can do—because what I wanted to do was go along with Your Honor and let him read, because the State said that I didn't give him a chance to read the whole thing. But what I'm saying is, if that is the case, I will go along with the State, we give him the whole thing, let him read it to himself, I will repeat my question, original question, if he now says something that we all know is different from this, then I get to impeach. Unless you want me to go ahead and just impeach, in which case I'll do that.
>
> [TRIAL COURT]: I'm not going to tell you what to do. I give up.

10 VRP (May 10, 2023) at 25.

###### b. Detective Foster cross-examination

The State presented testimony from Detective William Foster from the Pierce County Sheriff's Department. Detective Foster was the law enforcement officer responsible for investigating T.V.1's and T.V.2's allegations.

Defense counsel cross-examined Detective Foster, specifically regarding the depth of Detective Foster's investigation and who Detective Foster interviewed.

> [DEFENSE COUNSEL]: If one is looking for corroboration, where do you think the best corroboration would be from the story as you know it? Where do you think you'd be able to get the best corroboration?
>
> [FOSTER]: From the alleged perpetrator.
>
> [DEFENSE COUNSEL]: Is there a second place that maybe you might get corroboration?

[FOSTER]: Well, if I have the story from the children, and I get the story from the perpetrator or other family members, combine it together—

[DEFENSE COUNSEL]: From the alleged perpetrator, right?

[FOSTER]: Yes.

[DEFENSE COUNSEL]: Police officer, 24 years experience, I'm sure you know there are some constitutional rights that people are afforded when—

[FOSTER]: That is correct.

[DEFENSE COUNSEL]: Which I'm very sure you know you can't really talk about that he did that, right? So let's say we leave him alone.

Where else would you—from the story as you know it, where would be the place to look—the best place to look for corroboration?

[FOSTER]: In this case?

[DEFENSE COUNSEL]: Yeah. In this case.

[FOSTER]: Other family members.

13 VRP (May 11, 2023) at 58.

c.      Closing arguments

During closing arguments, defense counsel argued about the improbability of so many family members failing to catch the conduct that occurred between Ward, T.V.1, and T.V.2. Defense counsel also argued that law enforcement conducted a "lazy" investigation and failed to elicit pertinent information from material witnesses. 16 VRP (May 16, 2023) at 27. As a result, there was no evidence corroborating T.V.1's and T.V.2's allegations, and ultimately, the State failed to meet its burden.

4.      Verdict and Sentencing

The jury found Ward guilty of Count 1 and Count 2.  The jury acquitted Ward of Count 3 (second degree child molestation of T.V.2).

Because Ward was convicted of sex offenses, he was subject to "Appendix H – Sex Offenses Community Custody" conditions.  CP at 380.

The Appendix H conditions included:

17 [X] Have no direct and/or indirect contact with minors.

18 [X] Do not hold any position of authority or trust involving minors.

CP at 381.

Based on Ward's convictions and criminal history, Ward's sentencing range was 98 to 130 months to life.  During the sentencing hearing, the State requested the trial court impose 130 months to life, or the high end of the sentencing range.  Ward did not make a sentencing request.

The trial court sentenced Ward to 120 months to life with lifetime community custody. During sentencing, the trial court also stated:

> I do expect that Mr. Ward will abide by all of the conditions listed in Appendix H of the [presentence investigation].  We can incorporate that by reference or actually attach it to the Judgment and Sentence so it's clear what those requirements are.  And I also want him to have credit for time served, and that can be calculated by DOC.

18 VRP (June 16, 2023) at 18.

Ward appeals.

## ANALYSIS

Ward argues that he received ineffective assistance of counsel and the trial court violated his right to present a defense when it excluded certain evidence.  Ward also argues the trial court

19

abused its discretion when it imposed community custody conditions that affected his constitutional right to parent his child.

A.    INEFFECTIVE ASSISTANCE OF COUNSEL

       1.    Legal Principles

Criminal defendants are guaranteed the right to effective assistance of counsel. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *State v. Estes*, 188 Wn.2d 450, 457, 395 P.3d 1045 (2017). To demonstrate ineffective assistance of counsel, a defendant "must show both (1) deficient performance and (2) resulting prejudice." *Id.* at 457-58. We review claims of ineffective assistance de novo. *Id.* at 457.

An attorney's performance is deficient "if it falls 'below an objective standard of reasonableness based on consideration of all the circumstances.'" *Id.* at 458 (quoting *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995)). Courts maintain a strong presumption that an attorney's performance was reasonable. *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 539, 397 P.3d 90 (2017). However, a defendant may rebut this presumption by demonstrating an absence of any legitimate trial strategy or tactic. *Id.*

An attorney's conduct may be unreasonable if he or she fails to adequately research relevant law. *State v. Bertrand*, 3 Wn.3d 116, 132, 546 P.3d 1020 (2024); *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). "'When an attorney unreasonably fails to research or apply relevant statutes without any tactical purpose, that attorney's performance is constitutionally deficient.'" *Bertrand*, 3 Wn.3d at 132 (internal quotation marks omitted) (quoting *In re Pers. Restraint of Garcia-Mendoza*, 196 Wn.2d 836, 844, 479 P.3d 674 (2021)). Furthermore, an attorney "has an affirmative duty to conduct a reasonable investigation that enables counsel to

make informed decisions about how to best represent the client." *State v. K.A.B.*, 14 Wn. App. 2d 677, 712-13, 475 P.3d 216 (2020). "'[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Lui*, 188 Wn.2d at 539 (internal quotation marks omitted) (quoting *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003)). "Attorney mistakes or errors are bound to occur in any trial, but not every mistake will result in an 'adverse effect on the defense.'" *Bertrand*, 3 Wn.3d at 133 (quoting *Strickland v. Washington*, 466 U.S. 668, 693, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).

If an attorney's performance was deficient, courts must consider whether the deficient performance caused prejudice. *K.A.B.*, 14 Wn. App. 2d at 707. "Prejudice exists if there is a reasonable probability that 'but for counsel's deficient performance, the outcome of the proceedings would have been different.'" *Estes*, 188 Wn.2d at 458 (quoting *Kyllo*, 166 Wn.2d at 862). A reasonable probability, though lower than a preponderance standard, is "a probability sufficient to undermine confidence in the outcome." *Id.* "If either element of the test is not satisfied, the inquiry ends." *Kyllo*, 166 Wn.2d at 862.

2.      Ineffective Assistance of Counsel Claims Fail

Ward alleges several instances of his defense counsel's ineffective assistance and argues that even if each instance standing alone is insufficient to support an ineffective assistance of counsel claim, the cumulative effect of all the instances supports his ineffective assistance claim. Ward groups the various instances into categories—specifically, defense counsel's (1) alleged lack of preparation, (2) apparent unfamiliarity with criminal procedure, and (3) his "broadcast" to the jury that Ward invoked his right to remain silent. Br. of Appellant at 29.

a.      General lack of preparation

Ward argues that defense counsel was so unprepared that it deprived him of a fair trial. We disagree.

First, Ward argues that during the pretrial hearing on motions in limine, defense counsel brought an oral "'other suspect evidence'" motion without having filed a supporting brief. Br. of Appellant at 21. However, Ward fails to describe how his oral motion constituted deficient performance, and more importantly, how it was prejudicial. The record shows that after defense counsel made the motion, the trial court instructed defense counsel to file a supporting brief. Defense counsel then filed a supporting brief within 24 hours. Subsequently, the parties had an opportunity to argue their respective positions on the "other suspect evidence" motion prior to the start of trial. After fully hearing the parties' arguments, the trial court denied the motion.

Even if we assume defense counsel performed deficiently by making an oral "other suspect evidence" motion, nothing in the record shows any prejudice resulting from defense counsel's failure to have a written brief when he first made the oral motion. *K.A.B.*, 14 Wn. App. 2d at 707. Indeed, a written brief followed the oral motion within 24 hours. The parties later argued the motion as if defense counsel had filed a written motion in limine in the first instance.

Ward next argues that defense counsel's failure to provide a summary of expected witness testimony constituted deficient performance. Specifically, Ward asserts the failure to provide the summaries demonstrates defense counsel's failure to investigate and interview witnesses. However, the record shows that the trial court ordered defense counsel to provide the witness summaries, and defense counsel did so. While the summaries for most prospective defense witnesses were considerably lacking, defense counsel was able to orally articulate the substance

of the testimony of the primary witnesses he intended to call during the defense's case.

Furthermore, defense counsel explained why he submitted an extensive witness list:

> And the reason why we put them on the witness list is because there's some outstanding story that we don't really know how to reconcile as of yet. So just to be on the safe side, in case we are not able to resolve all that. And then we want to have the ability to recall them if we need to, and that's why they are on the defense's list.
>
> And so the other ones, I don't think the State will really be concerned about it because those ones are there just in case because, of course, one has to have a plan B. So just in case things don't understand and we need some character witnesses and that's why we—and this way just people that the defendant had worked with over the years that can vouch for his character. And so that's why we have them on there in case that becomes, who knows, maybe for sentencing or something, so. That's why they're there.

2 VRP (May 1, 2023) at 11-12. Thus, contrary to Ward's contention, the record shows that defense counsel had conducted a reasonable investigation. *Lui*, 188 Wn.2d at 539; *K.A.B.*, 14 Wn. App. 2d at 712-13. Moreover, Ward fails to argue how defense counsel's failure to provide sufficient summaries of witness testimony prejudiced him at trial or how the outcome of the proceedings would have been different had counsel timely provided the summaries. *Estes*, 188 Wn.2d at 458.

Ward also argues that defense counsel was "wholly unfamiliar with sex assault defense representation." Br. of Appellant at 23. Specifically, Ward points to defense counsel's comment that he did not know about delayed disclosure issues and his apparent misunderstanding of the "admission" of T.V.1's and T.V.2's testimony identifying Ward as a perpetrator. Here again, even assuming without deciding that defense counsel's performance was deficient, Ward fails to demonstrate prejudice. The record shows that despite defense counsel's comments regarding his ignorance about delayed disclosure issues, it did not appear to affect defense counsel's challenge relating to delayed disclosure; defense counsel had an opportunity to cross-examine Arnold, the

23

child interviewer, on delayed disclosure but chose to emphasize case staffing procedures instead. Similarly, despite defense counsel's earlier misunderstanding of "admitting" the twins' identification of Ward, defense counsel still presented a sex assault defense, which was the lack of corroboration of T.V.1's and T.V.2's versions of events and poor law enforcement investigation.

Ward faults defense counsel for not asking "for more time when it was clear the three weeks he had between coming onto the case and the first day of trial was insufficient for him to be prepared." Br. of Appellant at 24. However, the record shows that when the trial court allowed the substitution of counsel, the trial court conditioned the substitution on defense counsel not requesting a continuance based on his late entry into the case. The case was already over 600 days old at the time of the substitution of counsel. Ward *agreed* to the substitution of counsel after being told by the trial court that he could not request a continuance based on a late substitution and having had an opportunity to confer with both his former counsel and the new defense counsel.

"Prejudice exists if there is a reasonable probability that 'but for counsel's deficient performance, the outcome of the proceedings would have been different.'" *Estes*, 188 Wn.2d at 458 (quoting *Kyllo*, 166 Wn.2d at 862). Here, Ward does not argue prejudice. Furthermore, nothing in the record suggests Ward was prejudiced from any of the examples he raises. "If either element of the test is not satisfied, the inquiry ends." *Kyllo*, 166 Wn.2d at 862. Because Ward fails to demonstrate prejudice, his claim of ineffective assistance based on defense counsel's general lack of preparation fails.

b.      Unfamiliarity with criminal procedure

Ward argues that he received ineffective assistance of counsel because defense counsel filed a motion for reconsideration, titled "Motion for an Order of Amendment," following the trial

court's denial of the other suspect evidence; conflated motions in limine with a CrR 3.6 motion to suppress; and "'forgot'" impeachment procedure, confusing it with refreshing a witness's recollection. Br. of Appellant at 26.

Here, even if we assume without deciding that defense counsel's performance was deficient, Ward fails to demonstrate how defense counsel's conduct was prejudicial.[6]

First, in the middle of trial, defense counsel filed a Motion for an Order of Amendment regarding the other suspect evidence, and the trial court addressed the motion with the parties. The record shows that defense counsel's Motion for an Order of Amendment was functionally a motion for reconsideration of the trial court's evidentiary decision to exclude other suspect evidence. Despite the trial court's prior in limine ruling on the other suspect evidence, the trial court allowed defense counsel to argue the motion and engaged in a long colloquy with defense counsel. The trial court then denied the motion and provided extensive reasoning for its denial. Specifically, the trial court highlighted the lack of evidence connecting another suspect to the charged crimes.

In his briefing on appeal, Ward does not address how the outcome of the proceedings would have been different had defense counsel *not* filed a Motion for an Order of Amendment or filed the motion at another time. *Estes*, 188 Wn.2d at 458. Instead, Ward makes the conclusory argument that defense counsel "simply did not know what he was doing." Br. of Appellant at 27.

Second, as to defense counsel forgetting impeachment procedure, the record shows that defense counsel attempted to impeach Fred based on a response he gave in a prior interview regarding concerns the family had about Ethan allegedly exposing himself to T.V.1 and T.V.2.

---

[6] Our holding addresses only Ward's inability to establish prejudice for the instances raised in Ward's briefing.

When it became clear that defense counsel was struggling to properly impeach, the trial court excused the jury and walked defense counsel through the impeachment procedure. Defense counsel was then able to elicit the desired testimony from Fred.

The next day, defense counsel again struggled to properly impeach Fred. The trial court excused the jury and again walked defense counsel through the impeachment procedure. While the colloquy between the trial court and defense counsel was exceedingly convoluted and betrayed defense counsel's fundamental misunderstanding of impeachment procedure, defense counsel was again ultimately able to elicit the testimony he sought. Thus, because defense counsel was able to bring out the desired testimony, Ward fails to establish prejudice. *Bertrand*, 3 Wn.3d at 133 ("Attorney mistakes or errors are bound to occur in any trial, but not every mistake will result in an 'adverse effect on the defense.'" (quoting *Strickland*, 466 U.S. at 693)).

3.      Ward's Right to Remain Silent

Ward argues that defense counsel "broadcast to the jury that his client invoked his right to remain silent and did not cooperate with the investigation." Br. of Appellant at 29. Ward asserts that this conduct fell below an objective standard of reasonableness.

The State may not use a defendant's silence as substantive evidence of guilt. *State v. Romero*, 113 Wn. App. 779, 786-87, 54 P.3d 1255 (2002). However, "[m]ost jurors know that an accused has a right to remain silent and, absent any statement to the contrary by the prosecutor, would probably derive no implication of guilt from a defendant's silence." *State v. Lewis*, 130 Wn.2d 700, 706, 927 P.2d 235 (1996). When trial courts admit evidence of a defendant's silence, the issue is whether the State uses it as evidence of guilt. *State v. Thomas*, 142 Wn. App. 589, 595, 174 P.3d 1264, *review denied*, 164 Wn.2d 1026 (2008). "A mere reference to silence that is not a

'comment' is therefore not reversible error absent a showing of prejudice." *Id.* (internal quotation marks omitted) (quoting *State v. Sweet*, 138 Wn.2d 466, 481, 980 P.2d 1223 (1999)).

Here, contrary to Ward's contention, defense counsel's cross-examination of Detective Foster did not inform the jury that Ward invoked his right to remain silent or that Ward did not cooperate in the investigation. Instead, defense counsel merely referenced generically "some constitutional rights." 13 VRP (May 11, 2023) at 58. Also, despite defense counsel's statements and questions, Detective Foster never stated that Ward invoked his right to remain silent or that Ward did not cooperate with law enforcement. Indeed, defense counsel quickly moved on with his questioning. Any "mere reference" to silence by Detective Foster—if it could be called even that—is not a comment that would constitute reversible error. *Thomas*, 142 Wn. App. at 595. Most importantly, and as Ward *concedes* in his brief, the State "[p]roperly" "never used the testimony to infer Mr. Ward was guilty." Br. of Appellant at 29.

Thus, because defense counsel did not inform the jury that Ward invoked his right to remain silent or that Ward did not cooperate with the investigation, Detective Foster never testified that Ward invoked his right to remain silent, defense counsel moved on in his line of questioning, and the State neither used either defense counsel's general reference to "some constitutional rights" nor Detective Foster's testimony to infer Ward's guilt, Ward's claim of ineffective assistance fails. *Kyllo*, 166 Wn.2d at 862.

Finally, Ward asserts that the "cumulative effect of trial counsel's deficient performance prevented [him] from receiving a fair trial." Br. of Appellant at 30. Under the cumulative error doctrine, "the defendant must show that while multiple trial errors, 'standing alone, might not be of sufficient gravity to constitute grounds for a new trial, the combined effect of the accumulation

of errors most certainly requires a new trial.'" *State v. Clark*, 187 Wn.2d 641, 649, 389 P.3d 462 (2017) (quoting *State v. Coe*, 101 Wn.2d 772, 789, 684 P.2d 668 (1984)). However, the standard for claims of ineffective assistance of counsel is that a defendant must show that counsel's deficient performance resulted in prejudice. *Estes*, 188 Wn.2d at 457-58. Despite Ward's individual claims of deficient performance, Ward merely alleges prejudice without explaining how he was prejudiced. Thus, Ward's argument regarding the cumulative effect of defense counsel's deficient performance is not persuasive.

B.     RIGHT TO PRESENT A DEFENSE

1.     Legal Principles

Criminal defendants have a constitutional right to present a defense. *State v. Arndt*, 194 Wn.2d 784, 797, 453 P.3d 696 (2019), *cert. denied*, 142 S. Ct. 726 (2021); *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010). When analyzing whether a defendant's right to present a defense has been violated, a two-part test is applied. *Arndt*, 194 Wn.2d at 797. First, courts "review the trial court's individual evidentiary rulings for an abuse of discretion." *Id.* at 797-98. A trial court abuses its discretion if "'no reasonable person would take the view adopted by the trial court.'" *State v. Jennings*, 199 Wn.2d 53, 59, 502 P.3d 1255 (2022) (internal quotation marks omitted) (quoting *State v. Atsbeha*, 142 Wn.2d 904, 914, 16 P.3d 626 (2001)). Second, courts consider de novo whether those evidentiary rulings deprived a defendant of his or her right to present a defense. *Arndt*, 194 Wn.2d at 797-98. A defendant's right to present a defense is not violated if the defendant is still able to present relevant evidence to support their central defense theory. *Id.* at 812-13.

A defendant's right to present a defense is not absolute. *Id.* at 812. The evidence that a defendant seeks to present must be at least minimally relevant. *Jones*, 168 Wn.2d at 720; *see generally* ER 401, 402. "Defendants have a right to present only relevant evidence, with no constitutional right to present *irrelevant* evidence." *Jones*, 168 Wn.2d at 720 (emphasis in original). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401.

In assessing whether a defendant's right to present a defense has been violated, courts must balance the State's interest in excluding relevant evidence "against the defendant's need for the information sought to be admitted." *Arndt*, 194 Wn.2d at 812. Courts consider whether the excluded evidence constitutes a defendant's "'entire defense.'" *Id.* at 813 (quoting *Jones*, 168 Wn. 2d at 721).

2.      No Violation of Right to Present a Defense

Ward argues the trial court violated his right to present a defense. We disagree.

a.      Exclusion of evidence demonstrating bias/motive

Ward's initial defense theory was that Fred was a possible perpetrator of the abuse against T.V.1 and T.V.2 instead of Ward. Specifically, Ward wanted to introduce testimony from Dominga that T.V.1 and T.V.2 had told her that Fred touched them inappropriately in a bath when they were four or five years old. After a colloquy between the trial court and defense counsel, the trial court ruled that Ward had failed to meet his burden connecting Fred to the charged crimes such that Ward could introduce evidence suggesting Fred as a possible perpetrator.

29

i.      Evidentiary ruling—no abuse of discretion

Ward does not challenge the denial of other suspect evidence on appeal. Instead, Ward

challenges the trial court's ruling by arguing that the trial court erred when it prohibited Ward from

"raising any issues that would point out [Fred's] bias." Br. of Appellant at 33. In other words,

Ward wanted to use the other suspect evidence to demonstrate Fred's alleged bias and possible

"motive to help fabricate the allegations against Mr. Ward." Br. of Appellant at 33.

Ward's arguments are belied by the record. The record shows that during argument on the

defense's motion to admit other suspect evidence, defense counsel also wanted to use Dominga's

testimony about Fred to demonstrate that Fred had a motive to have T.V.1 and T.V.2 fabricate

their allegations against Ward—allegedly that Fred wanted revenge for the bath allegation against

him, which had originated from Dominga. The trial court asked defense counsel why he could not

address possible biases on cross-examination of witnesses. Defense counsel insisted the jury

needed to be made aware of why Fred was potentially biased. In response, the trial court stated:

> [TRIAL COURT:] So I've reviewed the briefs by both parties, and I think the case law is fairly consistent when talking about other suspect theories. It cannot be just a rumor. It can't be just a suspicion. There has to be a combination of facts or circumstances that point to a non-speculative link between the other suspect and the charged crime.
>
> And I am very concerned that, although I've read three interview transcripts and the briefing of the parties, I haven't seen a non-speculative link between [Fred] and the conduct that's been charged in this case.
>
> I understand that [Dominga] talked about the incident in a bath or a shower that may have involved [Fred]. It's not clear to the Court, first of all, that that was any sort of criminal conduct. It could have been a bath. It's also not clear to the Court that [Fred] was, in fact, the person involved.
>
> . . . .

. . . It could have been an accident. It's not the conduct that's being charged in this case, so I'm not really left with another suspect.

So I don't think the defense has met its obligation under the case law to present facts and circumstances that clearly point to someone other than the defendant as the guilty party. I'm afraid that if I admit allegations about [Fred] . . . the jury will be confused, that they will be invited to speculate based on something that's not even admissible, and that could be incredibly prejudicial.

And so I am going to deny the motion in limine; however, there were many arguments that [defense counsel] made that related more to problems with the investigation. What I'm saying here is not going to foreclose that. I think he can ask witnesses about the investigation and argue that theory because that, to me, is separate from the other suspect theory and it's not the Court's intent to preclude that.

What I am precluding, though, is the other suspect arguments and suggestions that Fred . . . was, in fact, the person who molested his daughters.

5 VRP (May 4, 2023) at 42-45.

Thus, the record shows that when the trial court made its evidentiary ruling, it was in the context of the "other suspect evidence" motion in limine. The record also shows the trial court gave defense counsel multiple opportunities to present evidence connecting Fred to the charged conduct and defense counsel presented none. "When there is no other evidence tending to connect another person with the crime, such as his bad character, his means or opportunity to commit the crime, or even his conviction of the crime, such other evidence is irrelevant to exculpate the accused." *State v. Thomas*, 150 Wn.2d 821, 857, 83 P.3d 970 (2004); *accord State v. Bass*, 18 Wn. App. 2d 760, 802, 491 P.3d 988 (2021) ("If the other suspect evidence is speculative or merely raises a suspicion, it is properly excluded as irrelevant."), *review denied*, 198 Wn.2d 1034 (2022). Because Ward failed to present any evidence connecting Fred to the charged conduct, other than rumor and speculation, whether or not Fred touched T.V.1 and T.V.2 inappropriately in a bath

years before is simply irrelevant. Irrelevant evidence is inadmissible. ER 402. Therefore, we hold the trial court did not abuse its discretion when it excluded evidence of Fred as an alternative perpetrator. *Arndt*, 194 Wn.2d at 797-98.

ii. Right to present a defense—no constitutional violation

The next question is whether the exclusion of this evidence violated Ward's constitutional right to present a defense—specifically, whether it prevented Ward from demonstrating Fred's possible bias and whether it was the only defense available. *Arndt*, 194 Wn.2d at 813. First, the record clearly shows that the trial court *did not* prohibit the defense from raising issues of possible bias when it made its ruling. The trial court explicitly stated its ruling was only in regard to Fred as a potential perpetrator of the abuse against T.V.1 and T.V.2 instead of Ward. Second, the record also shows that defense counsel was allowed to cross-examine Fred and Jocelyn on their relationship with Ward and other possible sources of bias against Ward.

Finally, the record shows that defense counsel presented evidence that law enforcement conducted poor investigation of the case. In his cross-examination of Detective Foster, defense counsel questioned Detective Foster extensively about who he spoke with and the several individuals Detective Foster *did not* speak with. For instance, defense counsel elicited the fact that when Detective Foster reached out to Bernadette, Dominga, and Ethan—individuals who would have been present when the abuses against T.V.1 and T.V.2 occurred—he only placed one phone call to Bernadette and left a voicemail, which was not returned. Detective Foster did not attempt to contact them further.

Other than a general reference to the trial court's exclusion of the "other suspect evidence," Ward fails to identify specific portions of the record demonstrating the trial court's violation of his

right to present a defense, nor does he argue how the excluded evidence could have still been admissible for a limited purpose. Because Ward was not prevented from presenting evidence of Fred's bias, and Ward had other defenses available that he presented, we hold that the trial court did not violate Ward's right to present a defense based on its exclusion of Ward's alleged other suspect evidence.

> b.     Exclusion of polygraph test evidence

Ward argues the trial court impermissibly restricted the defense when it precluded testimony that Ward volunteered to take a polygraph test. We disagree.

The record shows Ward arranged a polygraph examination for himself and later provided law enforcement with the results. Defense counsel wanted to admit evidence that Ward took a polygraph examination, without disclosing the results, while Fred refused. The parties did not agree or stipulate to the admissibility of Ward's polygraph test. The trial court ruled that evidence of Ward's willingness, and Fred's unwillingness, to take a polygraph test was inadmissible.

Generally, in Washington, testimony about polygraph tests is inadmissible without a stipulation from both parties. *State v. Renfro*, 96 Wn.2d 902, 905, 639 P.2d 737, *cert. denied*, 96 Wn.2d 902 (1982); *Thomas*, 150 Wn.2d at 860. Because polygraph tests are not admissible, "it is obvious that a defendant should not be permitted to introduce evidence of his professed willingness to take such a test." *State v. Rowe*, 77 Wn.2d 955, 958-59, 468 P.2d 1000 (1970). The Washington Supreme Court has opined, "At best such an offer is a self-serving act or declaration which is made without any possible risk. . . . [A] defendant has everything to gain and nothing to lose by making the offer, so the conduct underlying the so-called inference of innocence can well be feigned,

artificial and wholly unreliable." *Id.* Therefore, evidence of offers to take polygraph tests are "patently self-serving and thus inadmissible at the outset." *Id.*

Here, any evidence of Ward's or Fred's willingness to take a polygraph test is inadmissible. Further, the parties did not stipulate to the admission of evidence relating to Ward's polygraph examination. Thus, absent stipulation from the parties, any evidence relating to the fact that Ward took a polygraph test is inadmissible. *Renfro*, 96 Wn.2d at 905; *Thomas*, 150 Wn.2d at 860. Therefore, the trial court did not abuse its discretion when it denied Ward's request to admit the polygraph evidence. *Jennings*, 199 Wn.2d at 59.

With regard to whether the exclusion of the polygraph evidence violated Ward's right to present a defense, Ward simply makes the conclusory statement that the trial court's exclusion of the polygraph evidence prevented him from presenting a defense. "'Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration.'" *Ursich v. Ursich*, 10 Wn. App. 2d 263, 278, 448 P.3d 112 (2019) (quoting *Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290, *review denied*, 136 Wn.2d 1015 (1998)), *review denied*, 194 Wn.2d 1022 (2020); RAP 10.3.

Regardless, as discussed in the preceding section, Ward presented several theories for his defense. Ward's defense did not rest on his polygraph evidence alone. *Arndt*, 194 Wn.2d at 813. Because Ward had other defenses available that he presented, we hold that the trial court did not violate Ward's right to present a defense based on its exclusion of the polygraph evidence. Therefore, we hold the trial court did not violate Ward's right to present a defense when it excluded the polygraph evidence.

C.      COMMUNITY CUSTODY CONDITIONS

1.      Legal Principles

The Sentencing Reform Act of 1981, chapter 9.94A RCW, authorizes courts to impose crime-related prohibitions and affirmative conditions as part of any sentence. RCW 9.94A.505(9); *In re Pers. Restraint of Rainey*, 168 Wn.2d 367, 374, 229 P.3d 686 (2010). Appellate courts review sentencing conditions for abuse of discretion. *Rainey*, 168 Wn.2d at 374-75. "A court abuses its discretion if, when imposing a crime-related prohibition, it applies the wrong legal standard." *Id.*.

When a sentencing condition affects a fundamental constitutional right, a "'[m]ore careful review of sentencing conditions is required.'" *State v. DeLeon*, 11 Wn. App. 2d 837, 840, 456 P.3d 405 (2020) (alteration in original) (quoting *State v. Warren*, 165 Wn.2d 17, 32, 195 P.3d 940 (2008), *cert. denied*, 556 U.S. 1192 (2009)). "Such conditions 'must be narrowly drawn' and '[t]here must be no reasonable alternative way to achieve the State's interest.'" *Id.* at 841 (alteration in original) (quoting *Warren*, 165 Wn.2d at 34-35). Parents have the fundamental right to the care, custody, and companionship of their children. *Rainey*, 168 Wn.2d at 374. However, courts may impose conditions affecting an individual's right to parent if it is reasonably necessary to prevent harm to a child. *DeLeon*, 11 Wn. App. 2d at 841.

A trial court must conduct this inquiry on the record. *Id.* If the trial court fails to conduct a fact-specific inquiry, then the conditions that interfere with a fundamental right must be stricken and remanded for reconsideration. *Rainey*, 168 Wn.2d at 371.

2.      Remand to Trial Court Required

Ward argues the trial court abused its discretion when it failed to consider the impact of his community custody conditions on his fundamental right to parent his minor son. Here, the trial

court imposed the lifetime community custody conditions provided in Appendix H—conditions specifically for individuals convicted of sex offenses. Those conditions included:

17 [X] Have no direct and/or indirect contact with minors.

18 [X] Do not hold any position of authority or trust involving minors.

CP at 381.

Ward is the father of a minor child. Community custody conditions 17 and 18 directly impact Ward's right to parent his minor son.

Before imposing community custody conditions 17 and 18, the trial court did not conduct an inquiry on the record as to whether the conditions were narrowly drawn and whether there were any reasonable alternatives. *DeLeon*, 11 Wn. App. 2d at 841. The State concedes that the trial court failed to conduct the necessary inquiry on the record. We accept the State's concession and remand to the trial court for reconsideration of the conditions consistent with this opinion. *Rainey*, 168 Wn.2d at 371.

## CONCLUSION

We affirm Ward's convictions. With regard to the challenged community custody conditions, we remand to the trial court to reconsider those conditions consistent with this opinion.

No. 58412-3-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Veljacic, A.C.J.

Price, J.